[File No. 6549.]

THE FEDERAL LAND BANK OF ST. PAUL, a Body Corporate, Appellant, v. BISMARCK LUMBER COMPANY, a Corporation, and Owen T. Owen, as Tax Commissioner of the State of North Dakota, Respondents.

(297 N. W. 42.)

Opinion filed March 17, 1941.

*George F. Shafer* and *John Thorpe* (*Peyton R. Evans, Gerald E. Lyons,* and *Robert J. Barry* of counsel), for appellant.

*Alvin C. Strutz,* Attorney General, and *T. A. Thompson* and *B. F. Tillotson,* Assistant Attorneys General, for respondents.

NUESSLE, J. The question for determination in this case is as to whether the Federal Land Bank of St. Paul, hereinafter referred to as the appellant, is subject to the North Dakota Sales Tax on purchases made under the circumstances hereinafter disclosed.

The Sales Tax Act (Sess. Laws 1937, chap. 249) in force at the time this controversy arose, provides:

"Section 2. There is hereby imposed . . . a tax of two per cent (2 %) upon the gross receipts from all sales of tangible personal property, consisting of goods, wares, or merchandise, except as otherwise provided in this Act, sold at retail in the state of North Dakota to consumers or users. . . .

"Section 3. There are hereby specifically exempted from the provisions of this Act and from computation of the amount of tax imposed by it, the following:

"(a) The gross receipts from sales of tangible personal property which this State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this State. . . ."

The appellant, the Federal Land Bank of St. Paul, a body corporate, created pursuant to the Act of Congress, approved July 17, 1916 (39 Stat. at L. 360, chap. 245, 12 U. S. C. A. §§ 641 et seq.) and acts amendatory thereof, known and cited as the Federal Farm Loan Act, is engaged in the business of making loans to farmers in the state of North Dakota and states adjacent thereto. The respondent, The Bismarck Lumber Company, is engaged in the business of selling lumber and other building material as a retail dealer in Bismarck. In October, 1937, the appellant bought certain lumber and other building material from the respondent. This material was for use in repairing and improving the buildings and fences on certain farm lands owned by the appellant in North Dakota. These lands had been ac-

quired by appellant through the foreclosure of mortgages taken to secure farm loans made in the course of its business. The respondent added to the regular sales price of the material so bought, 2 per cent thereof, the amount of the state sales tax, reckoned pursuant to the provisions of § 2 of the Sales Tax Act, supra. The appellant paid the sales price but refused to pay the tax, claiming that no tax could be collected from it for the reason that it was an agent and instrumentality of the Federal Government and, therefore, exempt from any state taxation. The respondent, on the other hand, contended that the material so sold by it was subject to such tax and that it was its duty to collect the same. Action was then brought by the appellant to determine the controversy thus arising and for a declaratory judgment adjudicating and determining the rights, liabilities, status, and legal relations of the parties, and whether the sales in question were subject to the tax. The State Tax Commissioner was joined as a party defendant. The controversy was submitted to the district court of Burleigh county and that court held that the sales made to the appellant Bank by the respondent Lumber Company were subject to the tax; that the Lumber Company was required to collect and pay over to the state the tax on such sales, and that the appellant Bank was under legal obligation to pay the same. Judgment was entered accordingly. Thereupon the Bank perfected the instant appeal.

The tax here in question is imposed on retail sales. It is general in its operation. It is required to be paid by the buyer. Jewel Tea Co. v. State Tax Commissioner, ante, 229, 293 N. W. 386.

The appellant contends it is wholly exempt from the tax pursuant to § 3a of the Sales Tax Act, supra, since it is an instrumentality of the United States and, as such, is not liable for the payment of any state sales tax without the consent of Congress; that such consent has not only not been given, but on the contrary, by § 26 of the Farm Loan Act, the appellant has been expressly exempted from the payment of such tax. The appellant further contends that as it is an instrumentality of the Federal Government, the State Sales Tax Act, supra, is, as attempted to be applied in this case, null and void and in conflict with the Constitution of the United States in that it violates § 8 of Article 1 of the Constitution, which provides: "The Con-

gress shall have power . . . to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the Government of the United States, or in any department or officer thereof," and clause 2 of Article 6 of the Constitution, which provides: "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; . . . anything in the Constitution or the laws of any state to the contrary notwithstanding."

The issues thus made are so important and their solution so difficult, that we deem it necessary to consider somewhat at length the powers and rights of the Federal and state governments with respect to the matter of taxation.

As we read the authorities they establish beyond question that the fact that Congress may have decreed an exemption from state taxation is not in itself enough. Though Congress may waive immunity from taxation, it cannot by its mere fiat confer immunity. Its action in that respect must be grounded upon a constitutional foundation. It must be predicated upon the proposition that "the states have no power by taxation or otherwise to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government." M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579; Osborn v. Bank of United States, 9 Wheat. (U. S.) 738, 6 L. ed. 204; Clallam County v. United States, 263 U. S. 341, 68 L. ed. 328, 44 S. Ct. 121. But except as thus restrained the power of the states to tax is absolute.

We have found no better statement respecting the concurrent power of taxation of the National and state governments and the manner of the exercise of that power than that of Mr. Justice Strong in Union P. R. Co. v. Peniston, 18 Wall. (U. S.) 5, 21 L. ed. 787, which we quote:

"As was said in Lane County v. Oregon, 7 Wall. (U. S.) 77, 19 L. ed. 101: 'In respect to property, business and persons within their respective limits, the power of taxation of the states remained, and remains entire, notwithstanding the Constitution.' It is indeed, a concurrent power (concurrent with that of the general government),

and in the case of a tax upon the same subject by both governments, the claim of the United States as the supreme authority must be preferred; but with this qualification it is absolute. The extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised, are all equally within the discretion of the legislatures to which the states commit the exercise of the power. That discretion is restrained only by the will of the people expressed in the state Constitutions, or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the national government. There is nothing in the Constitution which contemplates or authorizes any direct abridgment of this power by national legislation. To the extent just indicated, it is as complete in the states as the like power within the limits of the Constitution is complete in Congress. Such are the opinions we have expressed heretofore, and we adhere to them now.

"There are, we admit, certain subjects of taxation which are withdrawn from the power of the states, not by any direct or express provision of the Federal Constitution, but by what may be regarded as its necessary implications. They grow out of our complex system of government, and out of the fact that the authority of the national government is legitimately exercised within the states. While it is true that government cannot exercise its power of taxation so as to destroy the state governments, or embarrass their lawful action, it is equally true that the states may not levy taxes the direct effect of which shall be to hinder the exercise of any powers which belong to the national government. The Constitution contemplates that none of these powers may be restrained by state legislation. But it is often a difficult question whether a tax imposed by a state does in fact invade the domain of the general government, or interfere with its operations to such an extent, or in such a manner, as to render it unwarranted. It cannot be that a state tax which remotely affects the efficient exercise of a Federal power is for that reason alone inhibited by the Constitution. To hold that would be to deny to the states all power to tax persons or property. Every tax levied by a state withdraws from the reach of Federal taxation a portion of the property from which it is taken, and to that extent diminishes the subject upon which Federal taxes must be laid. The states are, and they must ever be, coexistent

with the national government. Neither may destroy the other. Hence the Federal Constitution must receive a practical construction. Its limitations and its implied prohibitions must not be extended so far as to destroy the necessary powers of the states, or prevent their efficient exercise."

The pronouncement of Mr. Chief Justice Marshall in M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579, supra, that the power to tax involves the power to destroy, is now accepted as axiomatic. But considering the relationship of the Federal and state governments it is just as true that the power to exempt from taxation involves the power to destroy. Death may ensue as well from starvation as from strangulation. So, as was said in Union P. R. Co. v. Peniston, 18 Wall. (U. S.) 5, 21 L. ed. 787, supra: "The states are, and they must ever be, coexistent with the national government. Neither may destroy the other. Hence the Federal Constitution must receive a practical construction. Its limitations and its implied prohibitions must not be extended so far as to destroy the necessary powers of the states, or prevent their efficient exercise."

And the same thought is expressed in Metcalf v. Mitchell, 269 U. S. 514, 70 L. ed. 384, 46 S. Ct. 172, where it is said:

"But neither government may destroy the other nor curtail in any substantial manner the exercise of its powers. Hence, the limitation upon the taxing powers of each, so far as it affects the other, must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax or the appropriate exercise of the functions of the government affected by it.

"While it is evident that in one aspect the extent of the exemption must finally depend upon the effect of the tax upon the functions of the government alleged to be affected by it, still the nature of the governmental agencies or the mode of their constitution may not be disregarded in passing on the question of the tax exemption; for it is obvious that an agency may be of such a character or so intimately connected with the exercise of a power or the performance of a duty by the one government, that any taxation of it by the other would be

such a direct interference with the functions of government itself as to be plainly beyond the taxing power."

The foregoing excerpt is quoted with approval in James v. Dravo Contracting Co. 302 U. S. 134, 82 L. ed. 155, 58 S. Ct. 208, 114 A.L.R. 318. Again in Educational Films Corp. v. Ward, 282 U. S. 379, 75 L. ed. 400, 51 S. Ct. 170, 71 A.L.R. 1226, it is held: "The immunity of Federal instrumentalities from state taxation must be given such a practical construction as will not, on the one hand, unduly restrict the power of the government imposing the tax, or, on the other hand, the exercise of the functions of the government which may be affected by it."

The reasoning of the opinion in M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L ed 579, supra, is that the Federal Government can act only through agents; that it may employ such agents or agencies as it deems advisable, so it may create corporate agencies to execute its powers; that the states may not so tax its agents, whether individual or corporate, as to hinder or embarrass them in the performance of their governmental duties. The test is: Does the tax sought to be imposed obstruct governmental operations? If it does, it is unconstitutional. If it does not, it is valid. And this is a judicial and not an administrative or legislative question.

If a designated agent is an individual, no tax may be imposed that will in any way interfere with the performance of his governmental functions. But, in all other respects, he is subject to taxation the same as any other citizen, and the same rule applies with respect to corporate agencies. ". . . and it certainly cannot be maintained that banks or other corporations or instrumentalities of the government are to be wholly withdrawn from the operation of state legislation. The most important agents of the Federal government are its officers; but no one will contend that when a man becomes an officer of the government he ceases to be subject to the laws of the state. . . . The salary of a Federal officer may not be taxed; he may be exempted from any personal service which interferes with the discharge of his official duties, because those exemptions are essential to enable him to perform those duties. But he is subject to all the laws of the state which affect his family or social relations or his property, and he is liable to punishment for crime, though that punishment be imprisonment or

death. So of the banks. They are subject to the laws of the state, and are governed in their daily course of business far more by the laws of the state than of the Nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." First Nat. Bank v. Kentucky, 9 Wall. (U. S.) 353, 19 L. ed. 701, 703.

So a corporate agency is as much amenable to the tax laws of the states as is an individual agent. Accordingly, if a governmental agent engages in an enterprise which is not essential to the performance of his or its services to the government, to that extent he or it is subject to state taxation. This is wholly consistent with the concluding paragraph of the opinion in M'Culloch v. Maryland, supra: "This opinion does not deprive the states of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the state, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the state. But this is a tax on the operations of the bank and is, consequently, a tax on the operation of an instrument employed by the. government of the Union to carry its powers into execution. Such a tax must be unconstitutional."

And it is likewise consistent with what is said in Osborn v. Bank of United States, 9 Wheat. (U. S.) 738, 6 L. ed. 204, supra, where the holding in M'Culloch v. Maryland was re-examined. "We do not maintain that the corporate character of the bank exempts its operations from the action of state authority. If an individual were to be endowed with the same faculties, for the same purposes, he would be equally protected in the exercise of those faculties. The operations of the bank are believed not only to yield the compensation for its services to the government, but to be essential to the performance of those services. Those operations give its value to the currency in which all the transactions of the government are conducted. They are, therefore, inseparably connected with those transactions. They enable the bank to render those services to the nation for which

it was created, and are, therefore, of the very essence of its character, as national instruments. The business of the bank constitutes its capacity to perform its functions, as a machine for the money transactions of the government. Its corporate character is merely an incident, which enables it to transact that business more beneficially."

The Federal Farm Loan Act provides that the banks created pursuant to its provisions may be designated "depositaries of public money . . .; and they may also be employed as financial agents of the government; and they shall perform all such reasonable duties as depositaries of public money and financial agents of the government as may be required of them." 12 U. S. C. A. § 701. The banks are also empowered to invest their funds in the purchase of qualified first mortgages on land situated within the land bank district within which they are organized or for which they are acting. 12 U. S. C. A. § 781. We had occasion to consider the manner of the exercise of this power to some extent in Byrne v. Federal Land Bank, 61 N. D. 265, 237 N. W. 797. With respect to the matter of taxation material here, § 26 of the act (12 U. S. C. A. §§ 931–933) provides:

Section 931. "Every Federal land bank and every national farm loan association, including the capital and reserve or surplus therein, and the income derived therefrom, shall be exempt from Federal, state, municipal and local taxation, except taxes upon real estate held, purchased, or taken by said bank or association under the provisions of § 761 and § 781 of this chapter. First mortgages executed to Fedreal land banks or to joint stock land banks and farm loan bonds issued under the provisions of this act, shall be deemed and held to be instrumentalities of the government of the United States, and as such, they and the income derived therefrom shall be exempt from Federal, state, municipal and local taxation. . . .

Section. 933. "Nothing herein shall be construed to exempt the real property of Federal and joint stock land banks and national farm loan associations from either state, county, or municipal taxes to the same extent, according to its value, as other real property is taxed."

The constitutionality of the original Farm Loan Act was challenged in Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243, on the ground that the designation of the banks created by the act as fiscal agents and instrumentalities of the government was

but a pretext; that the banks were, in fact, created for the purpose of loaning money on farm mortgages; that this was essentially a private business and accordingly Congress had no power to endow the banks with the right to engage in that business and to exempt bonds issued by them from taxation.

The court held, however, "that the creation of these banks and the grant of authority to them to act for the government as depositaries of public moneys and purchasers of government bonds, brings them within the creative power of Congress though they may be intended, in connection with other privileges and duties, to facilitate the making of loans upon farm security at low rates of interest. This does not destroy the validity of these enactments any more than the general banking powers destroyed the authority of Congress to create the United States Bank, or the authority given to national banks to carry on additional activities destroyed the authority of Congress to create those institutions."

The clear implication of what is thus said by the court is that the making of loans on farm security is a private business, not governmental in character. That it is an activity additional but not essential to that which the banks were created to perform. And certainly there is nothing there said to imply that, so far as "these other privileges and duties to facilitate the making of loans upon farm security" are concerned, the states are powerless to tax.

The court cited as an authority sustaining this holding in the Smith Case, the case of First Nat. Bank v. Fellows, 244 U. S. 416, 61 L. ed. 1233, 37 S. Ct. 734, L.R.A.1918C, 283, Ann. Cas. 1918D, 1169. In the Fellows Case, the power of a national bank under the act of December 23, 1913 (38 Stat. at L. 262, chap. 6, 12 U. S. C. A. § 248 (k)), to act as trustee, executor, administrator or registrar of stocks and bonds "when not in contravention of state or local law" was challenged by the attorney general of the state of Michigan. See, Atty. Gen. ex rel. Union Trust Co. v. First Nat. Bank, 192 Mich. 640, 159 N. W. 335. The attorney general contended that this act conferred on national banks powers in excess of the authority of Congress and was, therefore, in contravention of the Constitution. It appears that the laws of Michigan authorized corporations to perform the functions in question. The court denied the attorney general's challenge on the

authority of M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579, and Osborn v. Bank of United States, 9 Wheat. (U. S.) 738, 6 L. ed. 204, supra, and said:

"What those cases established was that although a business was of a private nature and subject to state regulation, if it was of such a character as to cause it to be incidental to the successful discharge by a bank chartered by Congress of its public functions, it was competent for Congress to give the bank the power to exercise such private business in cooperation with or as part of its public authority. Manifestly this excluded the power of the state in such case, although it might possess in a general sense authority to regulate such business, to use that authority to prohibit such business from being united by Congress with the banking function, since to do so would be but the exertion of state authority to prohibit Congress from exerting a power which, under the Constitution it had a right to exercise. From this it must also follow that even although a business be of such a character that it is not inherently considered susceptible of being included by Congress in the powers conferred on national banks, that rule would cease to apply if by state law state banking corporations, trust companies, or others which by reason of their business are rivals or quasi-rivals of national banks are permitted to carry on such business. This must be since the state may not by legislation create a condition as to a particular business which would bring about actual or potential competition with the business of national banks and at the same time deny the power of Congress to meet such created condition by legislation appropriate to avoid the injury which otherwise would be suffered by the national agency. Of course as the general subject of regulating the character of business just referred to is peculiarly within state administrative control, state regulations for the conduct of such business if not discriminatory or so unreasonable as to justify the conclusion that they necessarily would so operate, would be controlling upon banks chartered by Congress when they came in virtue of authority conferred upon them by Congress to exert such particular powers."

As we read the opinion in First Nat. Bank v. Fellows, 244 U. S. 416, 61 L. ed. 1233, 37 S. Ct. 734, L.R.A.1918C 283, Ann. Cas. 1918D 1169, supra, the effect of the court's holding is that Congress has the power to confer upon governmental agencies and instrumentalities the

right to exercise functions which are not, in the first instance, essential to enable those agencies to perform their duties efficiently as such, if, under the laws of the state in which they may be located private institutions somewhat competitive in character ("rivals or quasi-rivals") have the right to perform similar functions and thereby are enabled to compete with the governmental agencies on a favored footing in the carrying on of business. But the court recognized that in such case the state was not barred from exercising the right of regulation, for the court said: "Of course as the general subject of regulating the character of business just referred to is peculiarly within state administrative control, state regulations for the conduct of such business if not discriminatory or so unreasonable as to justify the conclusion that they necessarily would so operate, would be controlling upon banks chartered by Congress when they came in virtue of authority conferred upon them by Congress to exert such particular powers."

It would seem, by parity of reasoning, that since business as carried on by private competitive enterprise is subject to the state's burden of taxation, to exempt governmental instrumentalities engaged in business not governmental in character from such burden must operate, so far as competitive business is concerned, to the detriment of private enterprise, and thus to the great disadvantage of the states. If this be true, there cannot be in such case that "harmonious and concordant exercise of national and state powers" contemplated and necessary under our theory of government.

There is another principle that should be taken into account in considering whether or not enterprises, private in character, carried on by governmental agencies in addition to though not essential to the performance of their governmental functions, shall be subject to taxation by the states. It was held in the early case of Bank of United States v. Planters' Bank, 9 Wheat. (U. S.) 904, 6 L. ed. 244, in an opinion written by Chief Justice Marshall, that "it is, we think, a sound principle, that when a government becomes a partner in any trading company it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen. Instead of communicating to the company its privileges and its prerogatives, it descends to a level with those with whom it associates

itself, and takes the character which belongs to its associates and to the business which is to be transacted."

So far as we can discover, there has never been any departure from that holding. On the contrary, it has been reaffirmed again and again. As, for instance, in the case of South Carolina v. United States, 199 U. S. 437, 50 L. ed. 261, 26 S. Ct. 110, 4 Ann. Cas. 737. There it appears that the state of South Carolina had established dispensaries for the wholesale and retail sale of liquor and prohibited sale by others than the dispensaries. The United States demanded the license tax prescribed by the Internal Revenue Act for dealers in intoxicating liquors and the state paid the same. Thereafter the state commenced an action in the court of claims to recover the amount thus paid. Judgment was entered for the United States. The state appealed. The supreme court affirmed the judgment and, among other things, speaking through Mr. Justice Brewer said:

"The right of South Carolina to control the sale of liquor by the dispensary system has been sustained. Vance v. W. A. Vandercook Co. 170 U. S. 438, 42 L. ed. 1100, 18 S. Ct. 674. The profits from the business in the year 1901, as appears from the findings of fact, were over half a million of dollars. Mingling the thought of profit with the necessity of regulation may induce the state to take possession in like manner of tobacco, oleomargarine, and all other objects of internal revenue tax. If one state finds it thus profitable, other states may follow, and the whole body of internal revenue tax be thus stricken down.

"More than this. There is a large and growing movement in the country in favor of the acquisition and management by the public of what are termed 'public utilities' including not merely therein the supply of gas and water but also the entire railroad system. . . .

"We may even go a step further. There are some insisting that the state shall become the owner of all property and the manager of all business. Of course, this is an extreme view, but its advocates are earnestly contending that thereby the best interests of all citizens will be subserved. If this change should be made in any state, how much would that state contribute to the revenue of the nation? If this extreme action is not to be counted among the probabilities, consider the result of one much less so. Suppose a state assumes, under its

police power, the control of all those matters subject to the internal revenue tax, and also engages in the business of importing all foreign goods. The same argument which would exempt the sale by a state of liquor, tobacco, etc., from a license tax, would exempt the importation of merchandise by a state from import duty. While the state might not prohibit importations, as it can the sale of liquor, by private individuals, yet, paying no import duty, it could undersell all individuals, and so monopolize the importation and sale of foreign goods.

"Obviously, if the power of the state is carried to the extent suggested, and with it is relief from all Federal taxation, the national government would be largely crippled in its revenues. Indeed, if all the states should concur in exercising their powers to the full extent, it would be almost impossible for the nation to collect any revenues. In other words, in this indirect way it would be within the competency of the states to practically destroy the efficiency of the national government."

In this connection, in addition to the authorities cited in South Carolina.v. United States, supra, see, North Dakota v. Olson (C. C. A. 8th) 33 F. (2d) 848, and cases cited; Clinton v. State Tax Commission, 146 Kan. 407, 71 P. (2d) 857, and cases cited; Central Market v. King, 132 Neb. 380, 272 N. W. 244.

We come now to the facts in the instant case. The appellant, Federal Land Bank, is engaged in the business of loaning money to farm owners. It secures these loans by mortgages upon farms. Certain of its mortgagors defaulted. Appellant foreclosed and acquired title to the security. Some of the lands thus acquired had buildings on them. The buildings were in disrepair. Lumber was required to repair them in order to conserve the buildings and make them habitable for tenants. Appellant bought lumber to make these repairs. The state seeks to impose the sales tax here challenged—a tax which all other purchasers of lumber must pay. The appellant claims immunity from the tax on the ground that it is a federal instrumentality. If we read the case of M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579, supra, aright, that claim must be predicated on the theory that to exact the tax would constitute an interference with the operations of the Federal Government. There can be no ground for such a con-

tention here. It is true that the tenuous device resorted to by Congress to clothe the Federal land banks in the garb of governmental instrumentalities and thus render their bonds tax exempt was held sufficient. Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243, supra. And in Federal Land Bank v. Crosland, 261 U. S. 374, 67 L. ed. 703, 43 S. Ct. 385, 29 A.L.R. 1, the exemption from taxation of the real estate mortgages taken by the banks was sustained. But it is one thing to hold the bonds of the land banks and the securities on which they are based tax exempt, and quite another to say that this tax exemption can be projected to so remote a business transaction as the purchase of lumber to repair buildings on lands acquired by the banks in an enterprise additional to rather than incidental or related to the ostensible governmental purposes for which they were created. Certainly the imposition of the tax on the transaction here in question could not hinder or embarrass the performance of the governmental functions—acting as a depositary and financial agent and buying government securities—the appellant was created to perform. Shadow ought not to be confused with substance. "The rule that governmental instrumentalities are immune from taxation will not be mechanically applied regardless of the consequence to the operations of government." Educational Films Corp. v. Ward, 282 U. S. 379, 75 L. ed. 400, 51 S. Ct. 170, 71 A.L.R. 1226, supra. And we cannot believe that the mere designation of an individual or corporation as a governmental agent confers on Congress the power to absolve every transaction in which that agent may engage or the property used or acquired in those transactions from liability to taxation in the state taxing district wherein the transactions are performed or the property held.

There has been an accelerating tendency to encroach in this direction on the rights of the states and to constrict their powers. This is made possible only by a disregard of the above rule which is but a restatement of the principle laid down in M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579, and Osborn v. Bank of United States, 9 Wheat. (U. S.) 738, 6 L. ed. 204, supra. We quote again from the latter case: "We do not maintain that the corporate character of the bank exempts its operations from the action of state authority. If an individual were to be endowed with the same faculties,

for the same purposes, he would be equally protected in the exercise of those faculties. The operations of the bank are believed not only to yield the compensation for its services to the government, but to be essential to the performance of those services. Those operations give its value to the currency in which all the transactions of the government are conducted. They are, therefore, inseparably connected with those transactions. They enable the bank to render those services to the nation for which it was created, and are, therefore, of the very essence of its character as national instruments. The business of the bank constitutes its capacity to perform its functions, as a machine for the money transactions of the government. Its corporate character is merely an incident, which enables it to transact that business more beneficially."

The confusion, and consequent disregard of the principle above stated, has arisen because of failure to distinguish between operations essential to the performance of governmental service and operations additional but not essential to the performance of that service. This distinction is emphasized in First Nat. Bank v. Kentucky, 9 Wall. (U. S.) 353, 19 L. ed. 701, supra, where it is said: "But it is argued that the banks, being instrumentalities of the Federal government, by which some of its important operations are conducted, cannot be subject to such state legislation. It is certainly true that the Bank of the United States and its capital were held to be exempt from that state taxation on the ground here stated, and this principle laid down in the case of M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 4 L. ed. 579, has been repeatedly affirmed by the court. But the doctrine has its foundation in the proposition that the right of taxation may be so used in such cases as to destroy the instrumentalities by which the government proposes to effect its lawful purposes in the states. . . . The principle we are discussing has its limitation, a limitation growing out of the necessity on which the principle itself is founded. That limitation is, that the agencies of the Federal government are only exempted from state legislation, so far as that legislation may interfere with, or impair their efficiency in performing the functions by which they are designed to serve that government. Any other rule would convert a principle founded alone in the necessity of securing to the government of the United States the means of exercising its legitimate pow-

ers, into an unauthorized and unjustifiable invasion of the rights of the States."

In First Nat. Bank v. Fellows, 244 U. S. 416, 61 L. ed. 1233, 37 S. Ct. 734, L.R.A.1918C 283, Ann. Cas. 1918D 1169, supra, the court sustained the power of Congress to endow national banks with the authority to perform functions additional but not essential to their governmental functions. But this was solely on the theory that unless the banks possessed that additional power they would not be in a position of equality in competition with private enterprise carrying on the banking business. And Mr. Chief Justice White was careful to say that in such case reasonable state regulations would be controlling. Accordingly, Congress may properly create corporations to act as government agents to execute any powers the government may possess. And these agents may be endowed with additional powers. But in view of the distinction made as between operations essential to the performance of governmental service and operations additional but not essential to the performance of that service, it follows that if those powers be not essential to the exercise of the governmental powers they must be considered and treated for all purposes the same as though exercised by individuals similarly engaged in governmental business or by any purely private enterprise. Otherwise, the Federal government may embark in any business anywhere, any time, in competition with private enterprise, untrammeled by the regulations and free from the burden of taxation to which private enterprise is subject —something undreamed of by the framers of the Constitution and something not contemplated when the opinions in M'Culloch v. Maryland and Osborn v. Bank of United States were written.

The power of Congress to create the Federal Land Banks was sustained because of "the grant of authority to them to act for the government as depositaries of public moneys and purchasers of government bonds." Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243, supra. These then are the governmental functions they are to perform. Thence springs their immunity from taxation. As a matter of fact, these functions could as well be effected by private bankers. For a private banker could serve as a depositary, a financial agent and a purchaser of government securities. That the land banks are corporations is merely an incident which

does not in the least affect the states' power to tax. "We do not maintain that the corporate character of the bank exempts its operations from the action of state authority. If an individual were to be endowed with the same faculties for the same purposes, he would be equally protected in the exercise of those faculties." Per Mr. Chief Justice Marshall in Osborn v. Bank of United States, 9 Wheat. (U. S.) 738, 6 L. ed. 204, supra. Yet, if a private banker were appointed a government agent to perform these services (and the instance has been known) who would be so bold as to say that he thus was absolved from state taxation and other requirements to which other citizens not government agents were subject regardless of whether his operations in behalf of the government were thereby in any manner hampered or obstructed.

Loaning money at interest to private enterprise is not a governmental function. The fact that a loan is made to a farmer does not distinguish it in this respect from a loan made to a butcher, a baker, or a candlestickmaker. When the land banks engage in this business, though they be governmental instrumentalities, they do not change its character. They operate in a private field for private profit in competition with private enterprise. It is true that because of congressional favor they have the advantage of an inexhaustible source from which to draw in making their loans and at a most advantageous rate of interest. But the stock of the banks is, in the main, privately owned. Indeed, it all may be owned privately. If there be dividends, the government does not participate though it own stock. Private owners of stock do participate. The banks are not banks of general deposit and discount. The business done by them provides no outlet for governmental securities, because, forsooth, the funds in the banks are obtained from the government itself, except in so far as their stocks and bonds are purchased and paid for by others than the government. And the theory of the Land Bank Act is that money thus derived is to be used in making the farm loans on which the bonds are based. In Federal Land Bank v. Priddy, 295 U. S. 229, 79 L. ed. 1408, 55 S. Ct. 705, the court, after analyzing the statute creating the land banks has this to say concerning them: "They thus have many of the characteristics of private business corporations distinguishing them from the

government itself and its municipal subdivisions and from corporations wholly government owned and created to effect an exclusively governmental purpose."

Since the farm loan business is not a business that is essential to enable the banks to perform the governmental function from which their tax immunity springs, to hold that the appellant is immune from the tax here in question is, in effect, to hold that Congress may by its mere declaration empower an agency, created as appellant was created, to engage in any business and exempt it from taxation however remote or inconsequential the effect of the tax burden may be upon the exercise of its governmental function. Let us pursue the practical application of such a holding in the instant case to its logical consequences. If the appellant can repair the buildings on its farms without paying the tax required of other purchasers of lumber to make similar repairs, by the same token it can buy machinery and equipment to operate those farms without paying the tax that other farmers must pay. It can employ men to operate those farms and provide them with groceries and other supplies which private enterprise similarly engaged must pay. It can buy logs or set up lumber camps and log them itself; it can build mills and mill its own lumber; it can erect factories and operate stores and distributing plants—all free from state regulation and taxation. And so on ad infinitum. And the effect with respect to the states will be infinitely more disastrous than that which is envisioned with respect to the national government in South Carolina v. United States, 199 U. S. 437, 50 L. ed. 261, 26 S. Ct. 110, 4 Ann. Cas. 737, supra. For individual initiative, lacking inducement, will languish; private enterprise, stifled by privileged and unburdened competition, will wither; and the states, their sources of sustaining revenue usurped and dried up, will starve.

In view of the foregoing considerations, we reach the conclusion that the tax here challenged meets the test laid down in M'Culloch v. Maryland, 4 Wheat. (U. S.) 738, 6 L. ed. 204, supra, and Osborn v. Bank of United States, 9 Wheat. (U. S.) 738, 6 L. ed. 204, supra. It is a valid exercise of the inherent taxing power abiding in the states. Its imposition in no way obstructs or interferes with the governmental function the appellant land bank was created to perform. It does not

burden or embarrass the constitutional operations of the national government. Accordingly, the State Sales Tax Act as applied in the instant case violates neither § 8 of Article 1, nor clause 2 of Article 6 of the Constitution of the United States.

But even though the authorities cited above be held not to sustain the conclusions we have predicated upon them, we are, nevertheless, of the opinion that the judgment of the court below must be affirmed. Section 26 of the Farm Loan Act (12 U. S. C. A., §§ 931–933) quoted supra, is specific in its statement of tax exemptions. It provides that every land bank *including* the capital and reserve, or surplus therein, and the income derived therefrom, shall be exempt from federal, state, municipal and local taxation, *except* taxes upon real estate acquired in satisfaction of debts or purchases at sales under judgments, decrees or mortgages held by it. Farm loan bonds issued by and first mortgages executed to the banks and the income derived therefrom are likewise exempted and to the same extent. And the last paragraph of § 26 (12 U. S. C. A. § 933) reiterates that nothing in that section shall be construed to exempt the real property of the banks from either state, county, or municipal taxes to the same extent, according to its value, as other real property is taxed.

It seems to us, that when Congress used the word "including" it sought to define exactly what was exempted, and when it used the word "except" and reiterated the exception, it evidenced its intention that, so far as the banks' real estate was concerned, it should be treated with respect to taxation exactly like real estate privately owned. The tax which the appellant challenges is a tax on sales required to be paid by the purchaser. The goods purchased were for use in and upon the real estate of the appellant Bank and not for use otherwise in carrying on the business of the Bank. Congress must have contemplated that the land banks would acquire lands, just as the lands in the instant case were acquired by the appellant, and it must have known that such lands might have buildings and fences upon them that would need conservation and repair. And so the necessity would arise to buy the material needed for these purposes. Yet, it made no mention of taxes of the character here in question.

In view of its particularity with respect to the items that should be exempted from taxation, this silence is significant. The challenged

tax is not a charge on the capital or the reserve or the surplus of the bank or the income derived from those items; nor is it a charge against the income derived from the farm loan bonds or the mortgages executed to the bank. It can only remotely affect those items. So it seems to us no implication can be drawn from the wording of the statute that transactions growing out of the use and operation of the lands should be exempted from reasonable and nondiscriminatory charges that private owners of similar lands are required to pay. If implication there may be, it is to the contrary.

"It is true that the silence of Congress, when it has authority to speak, may sometimes give rise to an implication as to the congressional purpose. The nature and extent of that implication depend upon the nature of the congressional power and the effect of its exercise. But there is little scope for the application of that doctrine to the tax immunity of governmental instrumentalities. The constitutional immunity of either government from taxation by the other, where Congress is silent, has its source in an implied restriction upon the powers of the taxing government. So far as the implication rests upon the purpose to avoid interference with the functions of the taxed government or the imposition upon it of the economic burden of the tax, it is plain that there is no basis for implying a purpose of Congress to exempt the Federal government or its agencies from tax burdens which are unsubstantial or which courts are unable to discern. Silence of Congress implies immunity no more than does the silence of the Constitution. It follows that when exemption from state taxation is claimed on the ground that the Federal government is burdened by the tax, and Congress has disclosed no intention with respect to the claimed immunity, it is in order to consider the nature and effect of the alleged burden, and if it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity." Graves v. New York, 306 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120 A.L.R. 1466.

The judgment of the district court is affirmed.

BURR, Ch. J., and SWENSON and GRIMSON, Dist. JJ., concur.

BURKE and MORRIS, JJ., did not participate, Hon. P. G. SWENSON, Judge of First Judicial District and Hon. G. GRIMSON, Judge of Second Judicial District, sitting in their stead.

CHRISTIANSON, J. (dissenting). I dissent. The question for decision here is whether sales of personal property within this state to a Federal Land Bank are subject to the state sales tax. The State Sales Tax Act (Laws 1937, Chap. 249) in force during the time involved in this controversy provided:

Section 2. "There is hereby imposed . . . a tax of two per cent (2%) upon the gross receipts from all sales of tangible personal property, consisting of goods, wares, or merchandise, except as otherwise provided in this Act, sold at retail in the state of North Dakota to consumers or users. . . ."

Section 3. "There are hereby specifically exempted from the provisions of this Act and from computation of the amount of tax imposed by it, the following:

"(a) The gross receipts from sales of tangible personal property which this State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this state. . . ."

Section 4. "Taxes paid on gross receipts represented by accounts found to be worthless and actually charged off, for income tax purposes may be credited upon subsequent payment of the tax herein provided; provided, that if such accounts are thereafter collected by the retailer, a tax shall be paid upon the amount so collected. . . ."

Section 6. "Retailers shall add the tax imposed under this Act, or the average equivalent thereof, to the sales price or charge and when added such taxes shall constitute a part of such price or charge, shall be a debt from consumer or user to retailer until paid, and shall be recoverable at law in the same manner as other debts. . . ."

Section 7. "It shall be unlawful for any retailer to advertise or hold out or state to the public or to any consumer, directly or indirectly, that the tax or any part thereof imposed by this Act will be assumed or absorbed by the retailer or that it will not be considered as an element in the price to the consumer, or if added, that it or any part thereof will be refunded."

The defendant Bismarck Lumber Company is engaged in the business of selling building materials as a retailer in Bismarck, North Dakota. During October, 1937, the plaintiff Land Bank purchased from said defendant Lumber Company certain building materials for use in repairing, maintaining and improving the buildings on certain farm properties then owned by the plaintiff Bank in North Dakota,— which properties had been acquired by the said Bank in the regular course of its business as a Federal Land Bank. The purchase price of such building materials amounted to some $401, exclusive of any state sales tax. The defendant Lumber Company added to such sales price or charge the amount of the state sales tax, namely, 2 per cent of such sales price, or the sum of $8.02. The plaintiff Bank paid the sales price, but refused to pay the amount of the sales tax that the defendant Lumber Company had added to the sales price, claiming that sales to a Federal Land Bank are exempted from such sales tax and that the defendant Lumber Company was under no obligation to account for, or pay tax on, such sales to the State. The plaintiff Land Bank contended that the imposition of a sales tax upon its purchases is forbidden by § 26 of the Federal Farm Loan Act, and by the Constitution of the United States, and that consequently the amount of such tax could not be added to the sales price, and that the plaintiff Land Bank was under no obligation to pay the same. The defendant Lumber Company, on the other hand, contended that the building material so sold by it was subject to such tax, and that consequently it was not only the right but the duty of the Lumber Company to add the amount of such sales tax to the purchase price. Action was brought by the Federal Land Bank against the Lumber Company and the State Tax Commissioner to obtain a determination of the controversy that had thus arisen and for a declaratory judgment adjudicating and determining the rights, liabilities, status and legal relations of the parties, and for a determination whether the sales in question were subject to the sales tax and whether the Lumber Company might legally add the amount of the sales tax to the sales price and whether the plaintiff Land Bank was under obligation to pay the same. The controversy was submitted to the district court of Burleigh county for determination and that court held that the sales by the Lumber Company to the plaintiff Land Bank were subject to the state sales tax; that the Lumber Company was re-

quired to collect and pay over to the state the sales tax on such sales, and that accordingly it might add the same to the sales price and that the plaintiff Bank was under legal obligation to pay the same. Judgment was entered in favor of the Lumber Company and the State Tax Commissioner and against the plaintiff, the Federal Land Bank of St. Paul, for $8.02, the amount of the sales tax in dispute, and the Federal Land Bank has appealed.

The appellant, the Federal Land Bank of St. Paul, contends:

1. That the imposition of the state sales tax upon the building material purchased by it within this state for the purpose of repairing and maintaining properties which it had acquired in the regular course of its business is forbidden by § 26 of the Federal Farm Loan Act, 12 U. S. C. A. § 931.

2. That it is forbidden by implication by the Constitution and laws of the United States, because the Federal Land Bank of St. Paul is an instrumentality of the United States and the tax in question here may in no event be imposed without the express consent of Congress and that Congress has given no consent.

Since all valid congressional enactments are the supreme law of the land and beyond interference by a State, the validity of State taxation of Federal instrumentalities must depend upon (1) the power of Congress to create the instrumentality, and, (2) the intent of Congress as manifested by law to protect it from, or to render it subject to, state taxation.

The Supreme Court of the United States has ruled that Congress acted within its constitutional power, (a) in creating the Federal Land Banks, and, (b) in exempting farm loan bonds issued by such Banks from Federal, state, municipal and local taxation. Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243. The court has declared that such banks "are instrumentalities of the Federal government, engaged in the performance of an important governmental function." Federal Land Bank v. Priddy, 295 U. S. 229, 231, 79 L. ed. 1408, 1411, 55 S. Ct. 705, 706. See also Knox Nat. Farm Loan Asso. v. Phillips, 300 U. S. 194, 81 L. ed. 599, 57 S. Ct. 418, 108 A.L.R. 738. That court, also, has condemned, as beyond the constitutional power of the state, a statute subjecting mortgages executed to a Federal land bank to the payment of a recording tax. Federal

Land Bank v. Crosland, 261 U. S. 374, 67 L. ed. 703, 43 S. Ct. 385, 29 A.L.R. 1.

The decisions of the United States Supreme Court are binding upon this court and definitely establish, (1) that a Federal land bank is an instrumentality of the national government, created by Congress, acting within its constitutional powers, to perform authorized governmental functions; and, (2) that such Bank is constitutionally endowed with the same immunity from State taxation, that the national government itself would have been endowed with, if it had engaged in such activity directly.

When Congress creates a corporation to carry on some activity that the national government may constitutionally undertake, such corporation may be endowed with the government's immunity from suit (Keifer & Keifer v. Reconstruction Finance Corp. 306 U. S. 381, 83 L. ed. 784, 59 S. Ct. 516), and from taxation. Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243; Graves v. New York, 306 U. S. 466, 83 L. ed. 927, 59 S. Ct. 595, 120 A.L.R. 1466; Pittman v. Home Owners' Loan Corp. 308 U. S. 21, 84 L. ed. 11, 60 S. Ct. 15, 124 A.L.R. 1263; Roberts v. Federal Land Bank, 189 Miss. 898, 196 So. 763; Federal Land Bank v. Statelen, 191 Wash. 155, 70 P. (2d) 1053; McGovern v. Federal Land Bank (Minn.) 296 N. W. 473. Whether such immunity exists, and if so the extent thereof, are questions of congressional intention. Federal Land Bank v. Priddy, 295 U. S. 229, 79 L. ed. 1408, 55 S. Ct. 705, supra; Smith v. Kansas City Title & T. Co. 255 U. S. 180, 65 L. ed. 577, 41 S. Ct. 243, supra; Federal Land Bank v. De Rochford, 69 N. D. 382, 287 N. W. 522.

The plaintiff, Federal Land Bank, was established under authority of the Federal Farm Loan Act of July 17, 1916. 39 Stat. at L. 360, Chap. 245, 12 U. S. C. A. §§ 641 et seq.

That Act provides: "That every Federal land bank and every national farm loan association, including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt from Federal, state, municipal, and local taxation, except taxes upon real estate held, purchased, or taken by said bank or association under the provisions of section eleven and section thirteen of this Act. First mortgages executed to Federal land banks, or to joint stock land banks, and farm loan bonds issued under the provisions of this Act, shall be

deemed and held to be instrumentalities of the Government of the United States, and as such they and the income derived therefrom shall be exempt from Federal, state, municipal, and local taxation." 39 Stat. at L. 380, chap. 245, § 26 (12 U. S. C. A. § 931).

The state sales tax is not a tax imposed upon the retailer for the privilege of engaging in business or for the privilege of making the sale. The law lays the burden of the tax upon the purchaser. Jewel Tea Co. v. State Tax Commissioner, ante, 229, 293 N. W. 386. It places upon the retailer the duty to collect the tax from the purchaser, and to account for and pay the tax collected over to the State Tax Commissioner (Monamotor Oil Co. v. Johnson, 292 U. S. 86, 93, 78 L. ed. 1141, 1147, 54 S. Ct. 575), but the law does not contemplate that the retailer shall pay the tax. On the contrary, he is forbidden to assume the tax or to hold out to purchaser that the tax "will be assumed or absorbed by the retailer or that it will not be considered as an element in the price to the consumer, or if added, that it or any part thereof will be refunded." Sales Tax Act, § 7.

"The ultimate burden of the tax, both in form and in substance, is thus laid upon the buyer, for consumption, of tangible personal property, and measured by the sales price. Only in event that the seller fails to pay over the tax collected or to charge and collect it as the statute requires, is the burden cast on him." McGoldrick v. Berwind-White Coal Min. Co. 309 U. S. 33, 43, 84 L. ed. 565, 568, 569, 60 S. Ct. 388, 128 A.L.R. 876.

The state sales tax is an enforced contribution exacted by the State in the exercise of its taxing power to provide for the support of the government. 61 C. J. pp. 68, 69. It is a substantial, direct and discernible tax imposed upon the purchaser of personal property, which the seller is required to collect from the purchaser and pay over to the State Tax Commissioner. If the sales which gave rise to this controversy are subject to the State sales tax, a tax of two per cent of the sales price, or $8.02 must be paid by the plaintiff Federal Land Bank. In the Act providing for the establishment of Federal Land Banks, Congress said: "Every Federal land bank. . . , including the capital and reserve or surplus therein or the income derived therefrom, shall be exempt from . . . state taxation, except taxes upon real estate

held, purchased or taken by said Bank under the provisions of Section eleven and Section thirteen of this Act.''

It is difficult to see that this language evidences any intention on the part of Congress to render a Federal land bank subject to a state tax on purchases made by such bank in carrying on the activities that such bank was created to perform. It seems to evidence quite a contrary intention.

"Taxation" is the act of laying a tax. It is the process or means by which the taxing power is exercised. 27 Am. & Eng. Enc. Law, 2d ed. p. 581; 1 Cooley, Taxation, 4th ed. p. 72, § 7; 61 C. J. 66; 24 Cal. Jur. pp. 20, 21. Taxation is a comprehensive term; it is not restricted to taxes on property, but "covers every conceivable exaction which it is possible for a government to make" in the exercise of its taxing power. Hylton v. United States, 3 Dall. (U. S.) 171, 1 L. ed. 556; Webster's New International Dictionary.

This is not a case where Congress has been silent. It has spoken clearly and emphatically. It has said: "Every Federal land bank . . . including the capital and reserve or surplus therein and the income derived therefrom, shall be exempt from state, municipal, and local taxation, except taxes upon real estate, held, purchased, or taken by said bank . . . under the provisions of" the Federal Farm Loan Act. Congress used the comprehensive term *taxation*. This includes every form of tax,—every exaction that might be made for state, municipal, or local purposes by exercise of the taxing power. Congress considered not only the question whether a Federal land bank should be subject to or immune from the taxing power of the state, but whether any of its assets should be subject to such power; and it declared that every Federal land bank, including the capital and reserve or surplus therein or the income derived therefrom, shall be exempt from State taxation, and then declared further that the only exception to the immunity from state taxation should be "taxes upon real estate held, purchased, or taken by said bank under the provisions of Section eleven and Section thirteen" of the Federal Farm Loan Act. The plain and natural meaning of what Congress said is that the State taxing power shall not extend to a Federal land bank, or to any of its rights or assets, with the single exception of such real estate as the Bank may hold

or have acquired under the provisions of §§ 11 and 13 of the Federal Farm Loan Act.

The imposition of the state sales tax is *state taxation*. It is not a tax upon any of the real estate held by the Bank. It is a tax laid directly upon the Bank as a purchaser within this state (McGoldrick v. Berwind-White Coal Min. Co. 309 U. S. 49, 84 L. ed. 572, 60 S. Ct. 388, 128 A.L.R. 876) of certain building material to be utilitzed by it in repairing structures on lands that it has acquired upon the foreclosure of mortgages it has taken in the regular course of its business. If the state may impose a tax upon a Federal land bank because it purchases certain personal property required in the conduct of its work in this state, the state may, also, impose a "use" tax if the Bank purchases such property without the state, and thereafter brings the property into this state and uses it here. Henneford v. Silas Mason Co. 300 U. S. 577, 81 L. ed. 814, 57 S. Ct. 524.

In the case of Federal Land Bank v. Crosland, 261 US 374, 67 L. ed. 703, 43 S. Ct. 385, 29 A.L.R. 1, the Supreme Court of the United States held that a tax imposed by the state of Alabama as a condition for the recording of a mortgage might not be imposed on a Federal land bank and that the imposition of such tax was forbidden by the Federal Farm Loan Act. The Supreme Court of Alabama sustained the tax on the ground that the amount of the recording tax was optional and that the Federal Land Bank was not required to put its mortgage on record and that if it did not record it, no tax was imposed, but that if it desired to have the mortgage recorded it must pay what others were required to pay for the registration of its security. The Supreme Court of the United States held this reasoning to be unsound, and pointed out that the laws of Alabama made it practically necessary to record real estate mortgages because unless recorded a mortgage would be of no effect as to a purchaser without notice, and that consequently the effect of the law was to impose the tax upon the mortgages of the Federal Land Bank and compel the Bank to pay such tax and that this was forbidden by the provisions of the Federal Farm Loan Act. The decision in the case of Federal Land Bank v. Crosland was adhered to and followed by the Supreme Court of the United States in its decision in Pittman v. Home Owners' Loan Corp. 308 U. S. 21, 84 L. ed. 11, 60 S. Ct. 15, 124 A.L.R. 1263, supra. That case in-

volved a tax imposed by the state of Maryland upon mortgages recorded or offered for record. The question arose whether mortgages taken by the Home Owners' Loan Corporation were subject to the tax. The court held that the imposition of the tax was forbidden by the provisions of the Home Owners' Loan Act that "the Corporation, including its franchise, its capital, reserves and surplus, and its loans and income" shall be exempt "from all taxation" imposed by "any state, county, municipality, or local taxing authority," except that "any real property of the Corporation shall be subject to taxation to the same extent, according to its value, as other real property is taxed." In the decision in the Pittman Case, the Court said:

"Congress has not only the power to create a corporation to facilitate the performance of governmental functions, but has the power to protect the operations thus validly authorized. 'A power to create implies a power to preserve.' M'Culloch v. Maryland, 4 Wheat. (U. S.) 316, 421, 422, 4 L. ed. 579, 605. This power to preserve necessarily comes within the range of the express power conferred upon Congress to make all laws which shall be necessary and proper for carrying into execution all powers vested by the Constitution in the Government of the United States. Const. Art. 1, § 8, ¶ 18. In the exercise of this power to protect the lawful activities of its agencies, Congress has the dominant authority which necessarily inheres in its action within the national field. Shreveport Case (Houston, E. & W. T. R. Co. v. United States) 234 U. S. 342, 351, 352, 58 L. ed. 1341, 1348, 1349, 34 S. Ct. 833. The exercise of this protective power in relation to state taxation has many illustrations. See, e. g., Bank of New York v. New York County, 7 Wall. (U. S.) 26, 31, 19 L. ed. 60, 62; Choate v. Trapp, 224 U. S. 665, 668, 669, 56 L. ed. 941, 943, 32 S. Ct. 565; Smith v. Kansas City Title & T. Co. 255 U. S. 207, 65 L. ed. 588, 41 S. Ct. 243; Trotter v. Tennessee, 290 U. S. 354, 356, 78 L. ed. 358, 359, 54 S. Ct. 138; Lawrence v. Shaw, 300 U. S. 245, 249, 81 L. ed. 623, 626, 57 S. Ct. 443, 108 A.L.R. 1102. In this instance, Congress has undertaken to safeguard the operations of the Home Owners' Loan Corporation by providing the described immunity. As we have said, we construe this provision as embracing and prohibiting the tax in question. Since Congress had the constitutional authority to enact this provision, it is binding upon this Court as the

supreme law of the land. Const. Art. 6." 308 U. S. 32, 33, 84 L. ed. 16, 17, 60 S. Ct. 15, 124 A.L.R. 1263.

The tax involved in this case is nondiscriminatory. It applies to all sales of goods, wares or merchandise sold at retail in this State to consumers or users, except to the sales of tangible personal property which the State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of the state. But the taxes involved in the Crosland and Pittman Cases were, also, nondiscriminatory. The taxes involved there were laid generally upon the recording of all real estate mortgages. The tax involved here is a direct tax of 2 per cent, upon the entire purchase price, to be paid by the purchaser. If sales within this state to a Federal land bank of tangible personal property which the bank is required to purchase in carrying on the functions which Congress intended it should carry on within this state, are subject to the sales tax, then the Federal land bank is required to pay a tax of 2 per cent on all such purchases made by it. In the instant case the tax so imposed would amount to $8.02,—the amount of the judgment rendered against the plaintiff Land Bank. As I construe the Federal Farm Loan Act, and the decisions of the Supreme Court of the United States interpreting and construing the same and analogous acts, the state is inhibited from laying this tax upon a Federal land bank, and the judgment against the plaintiff Bank should be reversed.